Filed 3/2/21  In re Paxton D. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re PAXTON D., a Person Coming Under the Juvenile Court Law. | B305497 (Los Angeles County Super. Ct. No. 19CCJP08106A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. COLTER C., Defendant and Appellant. | |

APPEAL from a jurisdictional finding and dispositional orders of the Superior Court of Los Angeles County.  Rashida A. Adams, Judge.  Affirmed.

Emery El Habiby, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Kim Nemoy, Assistant County Counsel, and Melania Vartanian, Deputy County Counsel, for Plaintiff and Respondent.

_____

Colter C. (father) challenges the juvenile court's jurisdictional finding and dispositional orders concerning his son Paxton D. (Paxton, born Oct. 2015). (Welf. & Inst. Code, §§ 300, subd. (b), 358, subd. (a);[1] Cal. Rules of Court, rule 5.690.) Specifically, he contends that (1) insufficient evidence supports the juvenile court's jurisdictional finding; (2) insufficient evidence supports the juvenile court's removal order; (3) the juvenile court abused its discretion in failing to continue the jurisdiction and disposition hearings; (4) the juvenile court erred in terminating jurisdiction; and (5) the juvenile court erred in only awarding father monitored visitation with Paxton.

We reject each of father's arguments. Accordingly, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

*Prior Child Welfare and Family Law History*

In April 2016, an allegation of general neglect by father of Paxton was deemed unsubstantiated. However, at that time, mother filed for and obtained a restraining order.

In November 2016, an allegation of emotional abuse by father of Paxton was substantiated. Specifically, father had

_____

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

Paxton in his arms when Amber S. (mother), Paxton's mother, objected to father's plans to take Paxton overnight. Mother told father to give Paxton back, but he refused. Mother then stated that she was going to call law enforcement. Father became angry and threw the child on the bed and pushed mother in the face. Paxton began to cry. Mother called law enforcement and father left. Father denied being in the home. Father violated the active restraining order by being in the home. At that time, mother was settling the matter in family court.

On April 5, 2018, the family law court ordered mother to have sole legal custody of Paxton, and both parents would share physical custody of the child. Father was ordered to have weekly visitation from Friday at 8:00 p.m. until Monday at 8:00 a.m.

*Detention Report (Dec. 19, 2019)*

On October 8, 2019, the Los Angeles County Department of Children and Family Services (DCFS) received a referral, alleging general neglect of Paxton by father. On October 7, 2019, father was arrested after his ex-girlfriend, Christine L. (Christine), contacted law enforcement to report that he was stalking her. Law enforcement stopped father's vehicle, which contained two large duffle bags of marijuana (approximately 20 pounds) and $14,000 in cash. Paxton was with father during the incident, sitting in the booster chair in the backseat of the vehicle.

Mother had been cooperative during this investigation, and she reported to DCFS that she would not allow father to have access to Paxton. This incident was the second time in 2019 that mother was called on a weekend to pick up her son from law enforcement.

3

Per the Incident Report, dated October 7, 2019, Burbank law enforcement (an officer and a detective) responded to a Fry's Electronics store regarding a possible restraining order violation. Christine, who had a restraining order against father, was hiding from father in her vehicle at the store's parking lot. Father was circling the parking lot and staring at her. Law enforcement observed father's vehicle leaving the parking lot. The right tail light was not operating, and father failed to stop at the posted stop sign. Law enforcement conducted a traffic stop based on father's violations. They observed Paxton in a booster car seat in the back seat. Per the detective's request, father exited the vehicle, and in speaking with father, both the officer and the detective smelled a strong odor of marijuana emitting from father's vehicle.

Father stated that he had just left the Logix Credit Union (across the street from Fry's Electronics). Father denied knowing that his ex-girlfriend was in the area. He also denied that there was a restraining order against him. The detective confirmed with police department records that there was a valid restraining order against father, and the protected party was Christine's seven-year-old daughter. Records also showed that father had an outstanding felony arrest warrant for dangerous drugs originating from the California Highway Patrol. Father was arrested for the outstanding felony warrant.

Father's car was impounded as it was parked illegally. Upon an inventory search of father's vehicle, the officer located two large duffle bags containing 22 large bags of suspected marijuana in the trunk of the vehicle. The officer also located $14,000 in cash underneath the two duffle bags. Based on the amount of suspected marijuana and the amount of money found,

father was subsequently charged with transportation of marijuana for sale. Father made a spontaneous statement at the jail booking counter that approximately 18 pounds of marijuana was found in his vehicle.

On December 5, 2019, the Children's Social Worker (CSW) received a phone call from father, who stated that the Burbank Police Department had dropped all charges against him because he had a legal amount (25 grams) of marijuana in his possession. The same day, the CSW spoke with Detective Totemwong, who reported that father was arrested for having 21.8 pounds of marijuana, and that the charges against father had not been dropped.

On December 6, 2019, the family law court issued a temporary restraining order against father listing Paxton as a protected person. Mother sought the temporary order at the request of the CSW and stated she needed help for the child. Mother reported that this situation had happened before, and she was worried for her son because father had no insight in how he was putting the child in danger. Mother was worried that father did not tell her what he did with their son. Mother could not believe father had $14,000 while she was struggling to keep Paxton fed and could not qualify for assistance. Mother expressed concern that father was not honest with her, was always claiming he was "'licensed to sell marijuana,'" and was stating that Christine had lied about father's abuse of her daughter.

On December 12, 2019, the Supervising Children's Social Worker (SCSW) arrived unannounced at the home of mother and Paxton. Mother reported that she left father several years ago after she could not get him to stop dealing drugs while taking

5

care of their infant son. Mother stated that she struggled with the fact that father would sell cocaine out of the home with the baby on the bed next to him. She also disclosed that father would allow drug addicts in their home and around their son. She believed that father was also a user, but she had not been around him in a long time. Mother reported father was aggressive with her and continually placed their child in harm's way and therefore, she left him. Mother said that father had never held a legitimate job to her knowledge, and although he claimed to be an Emergency Medical Technician (EMT), she believed he was not qualified nor working as an EMT.

Mother reported that she fought with father in family law court for years, and each time he would fight her for visitation and custody. Father was granted weekend visits, but he was not consistent in the beginning. Mother expressed frustration with the family law system as it did not hold father accountable for his behavior, and mother believed her son's safety was compromised in father's care.

During an unannounced visit to the home on December 12, 2019, there were no noted concerns in the home of the mother. Cody L. (Cody), mother's husband of two years, interacted well with the SCSW and appeared to have a genuine caring interest in mother and the child. Mother was pregnant with Cody's child.

Although mother had not seen marks or bruises on her son, she worried about father's aggression and anger issues. Mother did not know how father acted with Paxton. Mother reported being a victim of domestic violence in the past by father, and she was afraid of him. Father's previous arrest for slapping a small child concerned mother as Paxton was at a difficult age to handle. Previous referral history was indicative of physical abuse and

domestic violence. Father had repeatedly been involved in illegal activities and engaged in violence towards others while the child was present.

Mother described Paxton's behavior as more aggressive lately, and out of control upon returning from father's visits. She reported that Paxton was displaying hyperactive behavior and cried more frequently as he was adjusting to not seeing his father on weekends.

DCFS reported that there was a history of father exhibiting aggressive behavior. There was a nexus between this referral and others in the past as father continued to be aggressive and was stalking his ex-girlfriend, and involving the child in domestic violence and criminal activity.

Father's criminal history included a 2006 conviction for possessing concentrated cannabis and transporting a controlled substance. In 2009, father was arrested for battery. In 2017, he was arrested for possession of controlled substance for sale (felony), transporting controlled substance (felony), possession of money sale of controlled substance, infliction of injury upon a child (felony) and infliction of injury upon a spouse (felony). In April 2019, father was arrested for manufacturing/sale leaded cane billy,[2] and in October 2019, he was arrested for sell/furnish marijuana hash.

---

[2]     Penal Code section 22210 provides, in relevant part: "[A]ny person in this state who manufactures or causes to be manufactured, imports into the state, keeps for sale, or offers or exposes for sale, or who gives, lends or possesses any leaded cane, or any instrument or weapon of the kind commonly known as a billy . . . is punishable by imprisonment in a county jail."

*Section 300 Petition and Detention Hearing* (*Dec. 19 & 20, 2019*)

On December 19, 2019, DCFS filed a petition pursuant to section 300, subdivision (b), on behalf of Paxton, alleging: "The child, Paxton D[.]'s father, Colter [C.] created a detrimental and endangering environment for the child, in that the father transported 21.8 pounds of marijuana while the child was a passenger in the father's vehicle. On a prior occasion, the father sold cocaine in the presence of the child. On 10/07/19, the father was arrested for 11360(A) HS-Sell Furnish/Etc./Marijuana/Hash. Such a detrimental and endangering environment established by the child's father endangers the child's physical health and safety and creates a detrimental environment, placing the child at risk of serious physical harm, damage and danger."

Father did not appear at the detention hearing on December 20, 2019. The juvenile court found that DCFS had made diligent efforts to attempt to contact father for the hearing. The juvenile court ordered the child detained from father and released to mother. In so ruling, the juvenile court noted that the temporary restraining order issued by the family law court did not allow for any visitation. Mother filed a Notice of Hearing and Temporary Restraining Order (Form JV-250) and requested no visitation for father. The juvenile court did not order visitation for father, pending further court orders. The juvenile court took over the restraining order issued by the family law court. The matter was continued to January 10, 2020, for a hearing on the restraining order as well as father's arraignment.

*Arraignment Hearing and Hearing on Restraining Order (Jan. 10, 2020)*

Father appeared at the January 10, 2020, hearing. Father was arraigned and entered a general denial as to the allegation.

8

The juvenile court ordered monitored visitation for father. The court reissued the temporary restraining order, and father was served with a copy of the order in open court.

The juvenile court stated: "Father having waived time, the hearing date will be February 3rd, 2020, at 8:30 a.m. That is also the date of the trial in this matter. . . . [¶] The court orders the parents to return on that date, February 3rd, at 8:30 a.m. The court advises the parents that if you do not return on that date at that time, I can proceed without you, I can find the statements in the petition to be true, I can place your child out of your care and custody and could make orders regarding services with which you would need to comply in order for the child to be returned to you."

*Jurisdiction/Disposition Report (Jan. 21, 2020)*

On January 16, 2020, the Dependency Investigator (DI) made face-to-face contact with the child at mother's home. The DI observed the child to be clean, well-cared for, comfortable and bonded with his mother. The DI observed Paxton to be happy and well-adjusted to mother, who attended to Paxton's needs during the visit. The child reported he was happy with his mother and that mother took good care of him. Paxton denied being scared of anyone at home.

On January 15, 2020, the DI interviewed father in person. The DI smelled marijuana on father and asked him if he was using marijuana. Father replied, "'I have not used marijuana in 60 days. You can test me if you would like.'"

Father stated that he had done nothing wrong, that he worked for Cannacare, and that he was transporting their product. He indicated that the $14,000 belonged to the company. Attached to the Jurisdiction/Disposition Report were letters from

9

Cannacare and a contract with Cannacare, where father was a volunteer.

Father admitted that he had a warrant because law enforcement found drugs in his car, but the drugs were not his. He stated that the marijuana "'was for medical purposes under proposition 215 and I am under the care of an approved American Care Giver Association. This is an alternative medicine and I choose to not use drugs/alcohol or prescription medication.'" With respect to selling cocaine, father stated, "'I never in my life I have done, sold or had possession of cocaine.'" The DI explained to father that having the child in his vehicle with 20 pounds of marijuana was endangering the child. Father responded, "'It was in the trunk. What is the difference of people having a [six-]pack of beer, Norco, Codeine that is accessible to kids inside the car, that doesn't seem safe but it's not against the law.'"

On January 17, 2020, the DI spoke with father via telephone to obtain additional statements regarding the day of his arrest. Father denied stalking his ex-girlfriend, claiming that he had a restraining order against her. The DI informed father that law enforcement was able to smell marijuana from his vehicle, and father stated, "'There was no smell of marijuana. It was packaged and it was in the trunk. I was parked next to [a] weed shop and I have my Due Diligence.'" Father asserted that he had never endangered his child, and that he was a great father.

On January 16, 2020, the DI interviewed mother. Mother stated that father "'told me he was a caregiver, like someone that lives in the house and takes care of people. He did not tell me he transports marijuana. The day I had to pick up Paxton from the police, Paxton was on a scheduled visit with his dad and it was a

10

drop off day.'" When mother arrived at the scene to pick up Paxton, she saw Paxton crying while law enforcement was towing father's car. Mother stated, "'Paxton repeated to me of what he saw when his dad was arrested. He told me his dad had to put his hands behind his back and then head and he had cuffs on. He described it perfectly to me.'"

On January 16, 2020, the DI spoke with Paxton's maternal aunt by telephone. She had no safety concerns with mother's care of Paxton, stating that mother did a "'phenomenal job as a parent.'" The maternal aunt would sometimes babysit Paxton, and was going to continue to do so when mother's baby was born. The maternal aunt disclosed that she knew father when they were in school, and stated "he is not a good person." She reported that father had issues with rage, which she had witnessed. She disclosed that father did not make great decisions, but she had not seen him in a while and he could have changed.

On January 16, 2020, the DI spoke with the director at Paxton's daycare. She reported that Paxton had been attending the daycare for the last three years and always arrived happy and clean, and that mother took good care of her son.

Father reported he was currently employed at H&S Oil as a sales consultant in Irvine. He also reported he was employed with Cannacare Service Group as of March 2019, assisting with the transportation of medical marijuana. Father stated that he had been diagnosed with colon cancer two years ago, and he was currently in remission. According to father, "'I ingest medical marijuana, and this is a medical approved practice.'" He denied smoking marijuana.

Regarding his relationship with mother, father disclosed that he dated mother for 10 years. When they had Paxton, they

moved into his mother's house. Mother had a restraining order served on him, and father moved out. Father said that coparenting with mother was hard at first. He stated, "'She had anger and I was angry, and we fought through mediation for a year and half.'" The DI asked father if he and mother used drugs, and he stated, "'Since we were 18, we both had our weed cards and we would smoke wee[d] recreationally.'"

When questioned about his prior history with DCFS, father claimed that the allegations were not true and that he did not hit Christine's daughter. Rather, he asserted that he had a restraining order against Christine because she bit him. Father stated he did not slap the child on the face. He also denied having a physical altercation with Paxton's mother.

Mother reported she met father at school in the eleventh grade. Things were good for about two years, and then father started acting up and down. According to mother, "'He would lash out and a few minutes later act nice. It was really rocky.'" Mother ended the relationship after an incident when she and father were arguing and mother told father that she was going to call the police. Father pushed her and Paxton while mother was holding the child. Mother moved into the paternal grandmother's house, and she obtained a restraining order against father. She denied that father had used drugs during their relationship, but she suspected he was using cocaine. Mother denied having a medical marijuana card, but admitted to smoking marijuana when she was 18 years old. She denied smoking marijuana and having substance abuse issues. Mother reported that in 2018, father began having overnight weekend visits while she had custody of Paxton during the week. Mother indicated that she and father were able to coparent well until father's arrest.

On January 16, 2020, mother stated, "'I want this case to close with a Family Law Order granting me full custody and I want the Court to order monitor[ed] visits for the father with a Court approved monitor.'" She added, "'I want my son safe and I don't want him sad for not being able to see his father. He misses him.'" Mother stated she would be taking her son to counseling to help him deal with his trauma of witnessing father's arrest.

DCFS recommended that the juvenile court sustain the petition against father and terminate jurisdiction with a family law order in place granting mother full legal and physical custody of Paxton and monitored visits for father. DCFS reported mother had been cooperative and forthcoming, was protective of the child, and was able and willing to protect and provide for him. Mother indicated she was able to continue protecting her son without DCFS's involvement as she had a strong support system and was resourceful.

DCFS reported that since law enforcement was able to smell the marijuana from the car, the child, too, was able to smell the marijuana and inhale such substance. DCFS opined father appeared to lack insight of how he was endangering the child while transporting 20 pounds of marijuana as he believed he did not place the child at risk. Father denied domestic violence and hitting a child's face. He had unresolved anger management issues and displayed a pattern of hostile relationships, such as pushing mother while she was holding Paxton and hitting Christine's daughter in the face.

13

*Jurisdiction/Disposition Hearing (Feb. 3, 2020)*

On February 3, 2020, father was not present in court. After asking if there was any objection, the juvenile court found notice proper for the hearing.

Father's counsel asked for a brief continuance for father to be present. Counsel noted that father had been present at previous hearings. She also indicated that father had not communicated with her on February 3, 2020, and she was not sure why he was not present.

The juvenile court denied father's counsel's request for a continuance, stating: "The father was ordered to return at 8:30 for today's trial date. It is 9:34. The court has not been presented with any information explaining his absence, and the court finds good cause has not been presented to continue this matter."

Counsel for DCFS asked the juvenile court to sustain the (b)(1) allegation. Mother's counsel and child's counsel joined in DCFS's request. Father's counsel asked for the allegation to be dismissed, and in the alternative, asked for the sentence regarding father selling cocaine to be stricken.

After hearing argument and considering the documentary evidence, the juvenile court found the (b)(1) allegation to be true as alleged. It found father's statements that he was transporting marijuana as part of his employment to be highly questionable. But even if the juvenile court were to accept the fact that he was working for a marijuana business, this was a dangerous business requiring him to transport an extremely large amount of marijuana, which could be smelled by law enforcement, and carry a large amount of cash at the same time. The juvenile court noted that father was violating a restraining order in addition to

14

transporting the large amount of drugs with the child in the car. It found father's statements that he happened to be in the area were not credible. The juvenile court stated that father's high-risk activities with a very young child present showed an extreme lack of judgment, which placed the child at risk of suffering serious physical harm. It further noted that evidence of father's prior drug activity came from mother directly, who witnessed what was occurring in her home with the child present.

The juvenile court proceeded to disposition and admitted the same evidence from adjudication. It asked the parties if there was any additional evidence from any party, and counsel for DCFS and father's counsel replied, "No, your Honor." DCFS recommended that Paxton remain removed from father, and that the case close giving mother full legal and physical custody of Paxton with monitored visits to father. Father's counsel objected to closing the case, asked for father to have the opportunity to reunify with Paxton, and otherwise submitted the issue to the court. Mother's counsel and Paxton's counsel joined with DCFS.

The juvenile court declared Paxton a dependent of the court under section 300, finding that continuance in the home of father was contrary to the child's welfare. It further found by clear and convincing evidence that there was or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the child if returned to father, and there were no reasonable means by which the child's physical health could be protected without removing him from father's physical custody. The juvenile court's determination was based on the facts as found true in the sustained petition, father's conduct of engaging in extremely high risk and dangerous

activities while having the child in his care, and father's denials and lack of insight.

In addition, the juvenile court found that DCFS made reasonable efforts to prevent the need for removal, and there were no services available to prevent removal. It ordered Paxton removed from father and to remain released to mother.

Finally, the juvenile court found under sections 245.5 and 390 that the child was safely in the custody of mother, and that it was in the interests of justice and in the best interests of the welfare of the child that jurisdiction be terminated. It determined that mother was not in need of treatment or rehabilitation. The juvenile court then indicated that it would terminate jurisdiction upon receipt of a juvenile custody order providing mother sole legal and sole physical custody and monitored visitation to father.

*Termination of Jurisdiction (Feb. 10, 2020)*

The juvenile custody order was filed on February 10, 2020, ordering sole legal and sole physical custody to mother and monitored visits to father. That same day, the juvenile court terminated jurisdiction over Paxton.

*Appeal*

Father filed a timely notice of appeal.

## DISCUSSION

I. *Father's Request to Continue the Jurisdiction and Disposition Hearings*

Father asserts that the juvenile court abused its discretion in failing to continue the jurisdiction and disposition hearings, claiming a brief continuance would not have prejudiced the court or any of the parties.

16

A. <u>Applicable law and standard of review</u>

Section 352 governs continuances in dependency hearings. Continuances must be requested in writing at least two court days prior to the hearing date with affidavits or declarations detailing specific facts showing that a continuance is necessary, unless the court for good cause entertains an oral motion for a continuance. (§ 352, subd. (a)(3).) A continuance may be granted only upon a showing of good cause, and only if it is not contrary to the interests of the minor. (§ 352, subd. (a)(1), (2).) "In considering the minor's interests, the court shall give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements." (§ 352, subd. (a)(1).)

An order denying a continuance is reversed only upon a showing of abuse of discretion. (*In re Gerald J.* (1991) 1 Cal.App.4th 1180, 1187.) A juvenile court abuses its discretion if its decision is arbitrary, capricious or patently absurd. (*In re Tamneisha S.* (1997) 58 Cal.App.4th 798, 806.)

B. <u>Analysis</u>

Father never showed good cause by providing a valid explanation regarding why he had not attended the hearing as scheduled. Father's counsel only represented that father had not communicated with her on February 3, 2020, and counsel was not sure why father was not present. And, notice to father was deemed proper. After all, father was previously advised that if he did not return on February 3, 2020, at 8:30 a.m., the juvenile court could proceed without him, could find the statements in the petition to be true, and could place Paxton out of father's care and custody.

17

Nor has father demonstrated any prejudice from the juvenile court's denial of his request for a continuance. (Cal. Const., art. VI, § 13; *In re Celine R.* (2003) 31 Cal.4th 45, 59–60.) Father fails to show that the juvenile court would have reached a different result if a continuance had been granted. (*Id.* at p. 60.) Notably, when the juvenile court asked the parties if there was any additional evidence from any party, father's counsel replied, "No, your Honor." And there was nothing stopping father's counsel from proceeding to present evidence on father's behalf and challenge evidence submitted by DCFS.

For the first time on appeal, father asserts that a brief continuance would have allowed for father's presence and an opportunity to testify. But, the record makes plain that even if father had testified, no more favorable of an outcome would have resulted. Father continued to deny the threat that his actions posed to Paxton's safety. (*In re Esmerelda B.* (1992) 11 Cal.App.4th 1036, 1044 [denial is a relevant factor in determining whether the parent is likely to modify his behavior].) "One cannot correct a problem one fails to acknowledge." (*In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197.) And his steadfast denial was reinforced by father's counsel's argument that the marijuana found in father's custody did not put the child in danger because it was stored in the trunk of the vehicle and not accessible to the child.

No good cause was shown, and it was not in Paxton's interest to delay the proceedings any longer. It follows that the juvenile court did not abuse its discretion in declining to continue the hearing.

18

II. *Jurisdictional Finding*

Father argues that there was insufficient evidence to support the jurisdictional finding in Paxton's case.

A. Applicable law and standard of review

In dependency proceedings, DCFS must prove by a preponderance of the evidence that the child who is the subject of the section 300 petition comes under the juvenile court's jurisdiction. (§ 355, subd. (a); *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 248.) "In reviewing the sufficiency of the evidence on appeal, we look to the entire record for substantial evidence to support the findings of the juvenile court. We do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence, or determine where the weight of the evidence lies. Instead, we draw all reasonable inferences in support of the findings, view the record in the light most favorable to the juvenile court's order and affirm the order even if there is other evidence supporting a contrary finding. [Citations.]" (*In re A.M.* (2010) 187 Cal.App.4th 1380, 1387–1388.) On appeal, the parent has the burden of showing that there is insufficient evidence to support the juvenile court's jurisdictional findings. (*In re Geoffrey G.* (1979) 98 Cal.App.3d 412, 420.)

Section 300, subdivision (b)(1), provides, in relevant part: "A child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court: [¶] . . . [¶] The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, or the willful or negligent failure of the child's parent or guardian to adequately supervise or protect

19

the child from the conduct of the custodian with whom the child has been left, or by the willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment."

While harm is not presumed from the mere fact of drug or alcohol use (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 453), when an issue such as substance abuse causes the parent to act, or fail to act, in ways which jeopardize the child's safety, the court may find a risk of harm (*In re Travis C.* (2017) 13 Cal.App.5th 1219, 1226–1227; *In re Drake M.* (2012) 211 Cal.App.4th 754, 766–768).

"'Facts supporting allegations that a child is one described by section 300 are cumulative.' [Citation.]" (*In re T.V.* (2013) 217 Cal.App.4th 126, 133.) "It is not necessary for DCFS or the juvenile court to precisely predict *what* harm will come to [the children] . . . . Rather, it is sufficient that [the parent's] illness and choices create a substantial risk of *some* serious physical harm or illness." (*In re Travis C.*, *supra*, 13 Cal.App.5th at pp. 1226–1227.)

When a child is at risk, the juvenile court may take jurisdiction before the child has suffered any actual harm. (*In re Eric B.* (1987) 189 Cal.App.3d 996, 1003 ["The state, having substantial interests in preventing the consequences caused by a perceived danger is not helpless to act until that danger has matured into certainty. Reasonable apprehension stands as an accepted basis for the exercise of state power"].)

B. Analysis

Ample evidence supports the juvenile court's finding that Paxton falls within the scope of section 300, subdivision (b), as alleged against father. Paxton was at substantial risk of harm

20

due to father's high risk and dangerous actions, including transporting 21.8 pounds of marijuana in the child's presence.

Moreover, the evidence showed that father had a long history of substance abuse and drug-related criminal activity. At the time of his October 7, 2019, arrest, father had an outstanding felony arrest warrant for dangerous drugs. Six months prior to the October 2019 incident, father was arrested for manufacturing/sale leaded cane billy. In 2017, father was arrested for possession of controlled substance for sale (felony), transporting controlled substance (felony), and possession of money sale of controlled substance. Father's criminal history also included a 2006 conviction for possessing concentrated cannabis and transporting a controlled substance.

On appeal, father does not challenge the sustained allegation that he sold cocaine in Paxton's presence or that he was arrested for sell/furnish/etc./marijuana/hash. Instead, he focuses solely on the October 7, 2019, arrest, claiming that any lack of insight or protective capacity demonstrated by him had no nexus to a current risk of harm to Paxton because the October 2019 incident was not likely to recur. We cannot agree. Mother reported that this situation had happened before, and she was worried for her son because father had no insight as to how he was putting Paxton in danger. In addition, father's outstanding felony arrest warrant was due to dangerous drugs found in his car, which father denied belonged to him.

Moreover, there was ample evidence that father's dangerous actions affected his parenting and placed Paxton at risk. Since law enforcement was able to smell the marijuana from the car, presumably the child too was able to smell and inhale such substance. And, the October 2019 incident was the

second time in 2019 that mother was called on a weekend to pick up her son from law enforcement. There was also evidence of father's prior drug activity in Paxton's presence as mother witnessed father sell cocaine out of the home with Paxton on the bed next to him, and father allowed drug addicts in their home and around Paxton. Mother could not get father to stop dealing drugs while taking care of Paxton.

Given father's long criminal history, his outstanding felony arrest warrant for dangerous drugs, his conviction and numerous arrests for possessing and transporting a controlled substance, and his most recent arrest for transporting marijuana in Paxton's presence, there was substantial evidence that father's drug-related dangerous activities were ongoing.

Furthermore, there was direct evidence of a connection between father's dangerous behavior and the violence that threatened Paxton's safety. In fact, the present case began because father was stalking Christine when there was a restraining order against him protecting Christine's child. Yet, father denied stalking Christine and slapping Christine's child, and he denied there was a restraining order against him. Father's outright denial and failure to comprehend the recklessness of his actions is additional evidence that he placed Paxton at substantial risk of harm.

For all these reasons, the juvenile court's jurisdictional finding under section 300, subdivision (b), is supported by substantial evidence.

III. *Removal Order*

Father argues that the juvenile court erred in removing Paxton from his custody.

A. Forfeiture

Parties, including parents in dependency cases, are not permitted to raise issues for the first time on appeal that could have been raised in the trial court. "[A]ny other rule would permit a party to trifle with the courts" by "deliberately stand[ing] by" without making an objection, and "thereby permit the proceedings to reach a conclusion in which the party could acquiesce if favorable and avoid if unfavorable." (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1339; see also *In re Aaron B.* (1996) 46 Cal.App.4th 843, 846.) It is unfair to the trial court and the other parties for an appellate court to consider a defect that could have been presented to the trial court and cured. (*In re Cheryl E.* (1984) 161 Cal.App.3d 587, 603.)

On appeal, father asserts that the juvenile court improperly removed Paxton from his custody, claiming he was able to protect Paxton from harm. However, at disposition, father did not raise this contention. Instead, father's counsel objected to closing the case, asked for father to have the opportunity to reunify with Paxton, and otherwise submitted the issue to the court. Moreover, father's counsel made no objection to the juvenile court's order removing Paxton from father's custody. By failing to object to the juvenile court's removal order or to suggest in any way that the juvenile court release Paxton to him, father forfeited the opportunity to raise these issues on appeal.

For the sake of completeness, we turn to the merits of father's argument.

B. Standard of review and applicable law

"'After the juvenile court finds a child to be within its jurisdiction, the court must conduct a dispositional hearing. [Citation.] At the dispositional hearing, the court must decide

where the child will live while under the court's supervision.' [Citation.] 'A removal order is proper if based on proof of parental inability to provide proper care for the child and proof of a potential detriment to the child if he or she remains with the parent. [Citation.] "The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child." [Citation.] The court may consider a parent's past conduct as well as present circumstances.'" (*In re A.S.* (2011) 202 Cal.App.4th 237, 247, overruled in part on other grounds in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.)

For a child to be removed from parental custody under section 361, subdivision (c)(1), "DCFS has the burden to prove by clear and convincing evidence that there is a risk of substantial harm to the child if returned home and the lack of reasonable means short of removal to protect the child's safety. [Citations.]" (*In re Yolanda L.* (2017) 7 Cal.App.5th 987, 992.) We review a dispositional order removing a dependent child from parental custody for substantial evidence, keeping in mind a juvenile court had to find clear and convincing evidence supporting removal. (*In re V.L.* (2020) 54 Cal.App.5th 147, 155.)

"The court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accord with this discretion. [Citations.]" (*In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1006.) The dispositional order may not be reversed by the appellate court absent a clear abuse of discretion. (*Ibid.*) In other words, the appropriate test is whether the juvenile court exceeded the bounds of reason. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319.) There is no abuse of discretion where substantial evidence

supports the order.  (*In re Daniel C.H.* (1990) 220 Cal.App.3d 814, 839.)

C.  <u>Analysis</u>

Applying these legal principles, the juvenile court did not err in removing Paxton from father.  As set forth above, there is a substantial risk of harm if Paxton were returned to father, who continues to engage in dangerous activity.  And the juvenile court found that DCFS made reasonable efforts to prevent removal.

Urging us to reverse, father claims that as a reasonable alternative to removal, the juvenile court could have ordered father to tell mother where he and Paxton were at all times during their visits.  We do not see this option as a reasonable alternative to removal.  Mother was worried that father did not tell her what he did with Paxton, and she did not know how father acted with the child.  Moreover, father lacked insight of how he was endangering Paxton, and he believed he did not place the child at risk.  Despite being arrested for having 21.8 pounds of marijuana in his car, father told the CSW that the charges against him had been dropped because he had a legal amount (25 grams) of marijuana in his possession.  Father denied there was a smell of marijuana coming from the vehicle.  He stated he never endangered his child and he was a great father.  Father maintained he had done nothing wrong, that the marijuana was in the trunk, and he compared the transportation of marijuana to having beer, Norco, or codeine accessible to a child inside a car.  As recently as January 15, 2020, the DI smelled marijuana on father.

The record establishes that four-year-old Paxton would not be safe in father's custody and supports a reasonable inference that father's drug-related dangerous actions were continuing

issues.  Accordingly, there were no reasonable means to protect the child short of removal from father.

IV. *Termination of Jurisdiction*

Father claims the juvenile court improperly terminated jurisdiction because the parents had unresolved domestic violence issues, and the mother had unresolved substance abuse issues.

A. <u>Relevant law</u>

The juvenile court has broad statutory authority at disposition to make orders in the child's best interest, which includes an order terminating jurisdiction with the child to remain in the custody of a previously custodial parent, as long as the custody, visitation, and/or protective orders made at disposition sufficiently resolve any risk of harm to the child. (*In re Destiny D.* (2017) 15 Cal.App.5th 197, 207.)

B. <u>Analysis</u>

In the instant case, the only threat to Paxton's well-being was being exposed to father's drug-related high risk behavior, and the consequences thereof during unmonitored visits with father.  The juvenile court's order sustaining the section 300 petition was based on the facts as found true in the sustained petition, namely father's conduct of engaging in extremely high risk and dangerous activities while having the child in his care, as well as father's denials and lack of insight.

Father claims that mother was never drug tested and she would have benefitted from services such as domestic violence, anger management, parenting, and individual counseling. However, mother denied smoking marijuana and having substance abuse issues, and the juvenile court found that mother was not in need of treatment or rehabilitation.  In fact, mother

was nonoffending.  A parent's status as "offending" or "nonoffending" is a factor for the court to consider in exercising its discretion as to whether to terminate jurisdiction.  (*In re Destiny D.*, *supra*, 15 Cal.App.5th at p. 209.)  The maternal aunt stated that mother did a "'phenomenal job as a parent.'"  And, according to the director at Paxton's daycare, which Paxton had been attending for the last three years, he always arrived happy and clean, and mother took good care of her son.  Mother indicated she was able to continue protecting her son without DCFS's involvement as she had a strong support system and was resourceful.  Mother was dedicated to Paxton's well-being, which included monitored visits with father as mother stated in January 2020, "'I want my son safe and I don't want him sad for not being able to see his father.  He misses him.'"

With respect to domestic violence between mother and father, mother was not in a relationship with father and had not been around him in a long time.  The evidence made it clear that father was the perpetrator of domestic violence, while mother kept the child safe by ending the relationship, resorting to family law court and filing for restraining orders.  Custody exchanges took place at the police station.  And, mother and father were able to coparent Paxton until father was arrested in Paxton's presence in October 2019.  At that time, mother obtained a temporary restraining order against father listing Paxton as a protected person and not allowing for any visitation.

The juvenile court was able to sufficiently mitigate the risk going forward by issuing the new family law order, including that father have only monitored visits.  Accordingly, there was no reason for the juvenile court to continue jurisdiction.

27

V. *Custody and Visitation Orders*

Father claims the juvenile court abused its discretion in determining sole physical custody with monitored visits for father was in Paxton's best interests.

A. <u>Forfeiture</u>

Father forfeited any right to challenge the custody and visitation order because he failed to raise the issues before the juvenile court. When the juvenile court made its custody and monitored visitation order, father's counsel did not object or ask for joint physical custody or unmonitored visits. Thus, father forfeited his argument that the juvenile court abused its discretion in determining sole physical custody to mother with monitored visits for father was in Paxton's best interests.

For the sake of completeness, we will address the substance of father's argument.

B. <u>Applicable law and standard of review</u>

When the juvenile court terminates its jurisdiction, it issues an exit custody and visitation order that becomes part of an existing family law case or the basis for opening one. (§ 362.4.) The exit order is considered a final judgment and remains in effect after dependency jurisdiction is terminated. (§ 302, subd. (d); see also § 361.2, subd. (b)(1).) Thereafter, the family court may modify the exit order if "the court finds that there has been a significant change of circumstances since the juvenile court issued the order and modification of the order is in the best interests of the child." (§ 302, subd. (d); see also *Heidi S. v. David H.* (2016) 1 Cal.App.5th 1150, 1165.)

The juvenile court has broad discretion when making custody and visitation exit orders and such orders will not be reversed on appeal absent an abuse of that discretion.

(*Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 300–301.) "[W]hen a court has made a custody determination in a dependency proceeding, "a reviewing court will not disturb that decision unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination [citations].'" [Citations.] And [the California Supreme Court has] recently warned: "'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.'" [Citations.]" (*In re Stephanie M., supra,* 7 Cal.4th at pp. 318–319.)

The broad discretion of the juvenile court in making exit orders focuses on the best interests of the child in consideration of the totality of the circumstances; there are no presumptions with regard to shared custody. (*In re Chantal S.* (1996) 13 Cal.4th 196, 201; *In re Nicholas H.* (2003) 112 Cal.App.4th 251, 268.)

C. <u>Analysis</u>

The evidence fully supported the juvenile court's decision to protect Paxton by granting mother sole custody and requiring that father's visits be monitored.

Urging us to reverse, father again asserts that mother never received services for marijuana use, domestic violence, anger management, parenting, and individual counseling. Father attempts to liken mother to the father in *In re C.W.* (2019) 33 Cal.App.5th 835, where the appellate court reversed the custody award to the father and the termination of jurisdiction. (*Id.* at p. 866.) *In re C.W.*, *supra*, 33 Cal.App.5th 835 is inapposite. In that case, the father was an "admitted, convicted child sex abuser, [who] failed to reunify with his son, participated

29

in barely any reunification services, engaged in no sexual abuse counseling, and live[d] on the other side of the continental United States, far away from the watchful eye of even the most conscientious local child welfare officials." (*Id*. at pp. 837–838.) The father's "'history of sexually inappropriate behaviors'" was a sustained allegation, the father acknowledged that his relationship with his son was "'practically non-existent,'" and the juvenile court had terminated family reunification services. (*Id*. at pp. 843–844.)

In contrast, mother here was nonoffending, and the juvenile court found that mother was not in need of treatment or rehabilitation. Furthermore, there was no evidence that mother was currently using drugs. Mother was protective of Paxton by kicking father out of the home, calling law enforcement, and seeking and enforcing a restraining order. Paxton was well-cared, comfortable, happy, and bonded with mother. Mother was able and willing to protect and provide for Paxton.

Regarding the order for monitored visitation, because father's drug-related criminal activities were ongoing in Paxton's presence, endangering and traumatizing Paxton in the first place, the child was not safe in father's care. And, father did not understand that he endangered Paxton by transporting the child in a vehicle that smelled of and contained 21.8 pounds of marijuana. Furthermore, he denied responsibility for his actions, including the felony arrest warrant for dangerous drugs in his car that father claimed were not his.

It follows that the order allowing only for monitored visitation was necessary for Paxton's welfare and thus not an abuse of discretion.

## DISPOSITION

The juvenile court's jurisdictional finding and dispositional orders are affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.

        ASHMANN-GERST


We concur:


_____, P. J.

    LUI


_____, J.

    HOFFSTADT